

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:AXB
F. #2020R01096

*610 Federal Plaza*
*Central Islip, New York 11722*

March 11, 2022

By ECF

Honorable Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Konstantinos Zarkadas
                 Criminal Docket No. 21-363 (GRB)

Dear Judge Brown:

      The government respectfully submits this letter in connection with the sentencing of defendant Konstantinos Zarkadas, which is scheduled for March 18, 2022. As set forth in the Presentence Investigation Report ("PSR"), the United States Probation Office ("Probation") has estimated that the applicable United States Sentencing Guidelines range for the defendant is 63 to 78 months' imprisonment. (PSR ¶ 70.) The government respectfully submits that a sentence within this range, together with a fine of not less than $80,000 and full restitution to the government, would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

    I.    The Offense of Conviction

      On March 1, 2020, in reaction to the rapid spread of COVID-19 within the United States, the President declared a state of national emergency. (PSR ¶ 6.) On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide financial assistance to the millions of Americans who were suffering the economic effects of the COVID-19 pandemic. (Id. ¶ 7.) Through the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") system, the CARES Act authorized hundreds of billions of dollars' worth of loans, many of which were forgivable, to distressed small businesses to use for job retention and other critical expenses. (Id. ¶¶ 7-9.)

      Against that backdrop, the defendant—a medical doctor with a net worth exceeding $2 Million—set out to fraudulently obtain millions of dollars' worth of these

disaster relief loans, which he would ultimately use to make extravagant personal purchases and maintain a lavish lifestyle.

Between March 30, 2020—just three days after the enactment of the CARES Act—and July 20, 2020, the defendant applied for 11 separate PPP and/or EIDL loans on behalf of corporate entities he controlled. (PSR ¶¶ 10-11.) The applications contained materially false information concerning a range of criteria specifically designed to allow the Small Business Administration and lending institutions administering the programs to distinguish between qualifying and non-qualifying applicants. These criteria included, but were not limited to, the entities' number of employees, payroll costs, and intended use of the loan proceeds. (Id. ¶ 10.) Based on the false information he provided, the defendant was approved for approximately $3,796,849.50 worth of disaster relief funds, all of which were deposited into bank accounts he controlled. (Id.)

Immediately upon receiving these funds, to conceal their true source and fraudulent nature, the defendant laundered them through various bank accounts he controlled. (PSR ¶ 12.) He then used the loan proceeds in a number of patently improper ways, all of which were meant to enrich himself. (Id.) For example, the defendant bought himself and his family members Cartier and Rolex wristwatches collectively valued at $140,000. (Id.; Def. Sent'g Memo 2.) The defendant also used $194,915.42 worth of disaster relief funds to finance the down payment on a yacht for his brother-in-law. (PSR ¶ 12.) Acutely aware that he was misusing the loan proceeds, the defendant made this payment via check payable to his sister and wrote "repayment for payroll" in its memo line. (Id.) Notably, the sister was not involved in the transaction; the check was issued to her solely for the purpose of further concealing the defendant's fraud. (Id.) The defendant also used approximately $3 Million of disaster relief funds to partially discharge a civil judgment entered in a lawsuit stemming from the defendant's breach of a commercial real estate lease. (Id. ¶ 63 n.3.)

Rather shockingly, the defendant even used $80,000 of fraud proceeds to settle a lawsuit brought by the Civil Division of the United States Attorney's Office in this district. (PSR ¶ 15.) As explained in the PSR, in United States v. Zarkadas, 20-CV-3410 (GRB), the government alleged, inter alia, that the defendant dispensed more than 20,000 doses of Phentermine, an amphetamine-like weight loss drug, without keeping accurate records of the transactions and failed to comply with other recordkeeping obligations imposed by the Controlled Substances Act. (Id.) Shortly before his guilty plea in this case, on October 8, 2020, the defendant used $80,000 in COVID-19 emergency relief funds to settle that lawsuit without admitting wrongdoing. (Id.)

On November 13, 2021, the defendant appeared before this Court and pleaded guilty to a two-count Information charging him with disaster relief fraud and wire fraud, in violation of Title 18, United States Code, Sections 1040 and 1343, respectively. (PSR ¶¶ 1-3.) Pursuant to the parties' plea agreement, at the time of his plea, the defendant forfeited the sum of $200,000 and four wristwatches. (Id. ¶ 14.)

2

II. <u>Guidelines Calculation</u>

The Guidelines calculation, as set forth in the PSR, is as follows:

| | | |
|---|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus: | Loss Exceeding $3.5 Million (§ 2B1.1(b)(1)(J)) | +18 |
| Plus: | Fraud in Connection with Major Disaster or Emergency Relief Benefits (§ 2B1.1(b)(12)) | +2 |
| Plus: | Derivation of at Least $1 Million from Financial Institutions (§ 3C1.1) | +2 |
| Less: | Acceptance of Responsibility (§ 3E1.1(a)-(b)) | <u>-3</u> |
| Total: | | <u>26</u> |

(PSR ¶¶ 21-32.) Accordingly, based upon a total offense level of 26 and Criminal History Category I, the applicable Guidelines range for the defendant is 63 to 78 months' imprisonment.[1] (Id. ¶ 70.) Probation has recommended a principal sentence of 63 months' imprisonment.

III. <u>Argument</u>

As set forth herein, a fair application of the § 3553(a) factors compels the conclusion that a Guidelines sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Initially, the Guidelines accurately reflect the seriousness of the defendant's crime. See 18 U.S.C. § 3553(a)(2)(A). In a once-in-a-generation public health crisis, the defendant saw an opportunity to manipulate a government welfare program for his own self-enrichment. In that regard, it bears emphasizing the deliberate and repeated steps the defendant took to effectuate his fraud—taking time away from his personal and professional life amid the COVID-19 pandemic to create and submit 11 separate fraudulent loan applications, on behalf of six different entities, over the course of several months. Notably, accompanying each application were fake tax documents purporting to show that a particular corporate entity was financially distressed when, in actuality, the defendant had no intention of using any loan proceeds to support those businesses or their employees. That the defendant began this venture just three days after the enactment of the CARES Act, when

---

[1] Under § 1B1.1.11 of the Guidelines, Count One and Count Two of the Information are grouped for purposes of determining the applicable offense level. (PSR ¶ 20.)

3

disaster relief funds first became available, speaks to the truly depraved nature of the offense conduct.

The Court should reject the defendant's current contention that the entire criminal scheme was somehow designed to be a stopgap measure to satisfy a debt owed to his landlord. See, e.g., Def. Sent'g Memo 3 (claiming the defendant "engage[d] in the conduct here to repay a judgment creditor"); id. (claiming the defendant believed he could "borrow" disaster relief funds to discharge his debt); id. at 7 (claiming the defendant's plan was "to make everyone whole"). This after-the-fact justification is wholly inconsistent with the undisputed facts of the case. For starters, if the defendant's plan was to "borrow" enough money to hold his creditors at bay, it stands to reason that he would have done just that and "borrow" the full $4.7 Million he owed to his former landlord. Instead, he applied for, and received, fully a million dollars less than could ever be sufficient to discharge the debt.[2]

More fundamentally, though, the defendant's attempt to recast his crime as a supposedly desperate bid to repay his creditors rings hollow in light of how he actually spent the loan proceeds. As described herein, the defendant used the stolen money frivolously to lease luxury cars and purchase expensive jewelry—in that regard, he essentially gave away $194,000 to his brother-in-law to finance the down payment on a yacht that the brother-in-law was meant to own and use. Under these circumstances, the defendant's attempt to portray his actions as a last-ditch effort to forestall financial ruin is unpersuasive.

A Guidelines sentence is also necessary to promote respect for the law and achieve deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B). The sheer scope of the defendant's fraud, coupled with its proximity in time to the availability of emergency relief funds, speaks to the defendant's lack of respect not only for the CARES Act but also for the government's broader efforts to buoy the economy during the pandemic. Indeed, as the Probation Department has noted, it is clear that the defendant quickly saw the government's effort to keep struggling businesses afloat as little more than a cash giveaway, which he could use—presumably without consequence—"partially to pay off his recklessly accrued debt, and partially to make further ill-advised purchases." See Sent'g Rec. 2.

Even setting aside his disregard for the CARES Act, the record makes clear that this defendant has a lengthy history of flouting the law. In fact, the defendant's lack of a criminal record tends to camouflage an underlying inability, or unwillingness, to follow rules. Perhaps nowhere is that fact more apparent than the defendant's brazen use of stolen government funds to settle a lawsuit, brought by the United States Attorney, to hold the defendant accountable for violations of the Controlled Substances Act. Although the Probation Department has concluded that the defendant appears unable to pay a fine (the government does not agree), in addition to the forfeiture and restitution obligations set forth

---

[2] [redacted]

in the parties' plea agreement, the Court should require the defendant, as a component of his sentence, to pay an additional $80,000 to account for this egregious deceit.

Along these lines, the PSR details numerous instances of the defendant's proclivity toward violating the law when it suits him. Take, for example, the defendant's ownership of an $850,000 home in Glen Cove. According to the PSR, although the defendant makes the mortgage payments on the home and lives there with his family, he arranged for a friend to appear on the mortgage because "it was determined that the loan payments would be cheaper if the defendant was not on the mortgage loan." (PSR ¶ 41 n.1.) "The intent was to refinance the loan at a later time and add the defendant to the mortgage loan," but the defendant never did so. (Id.) Make no mistake about this arrangement: the defendant committed mortgage fraud by using a straw purchaser to artificially lower his loan payments. Taken together with the defendant's troubling history of breaching employment contracts and leases, it is clear that he viewed the availability of COVID-19 disaster relief funds as just another chance to game the system. And in the absence of a considerable sentence here, the Court has no reason to believe the defendant will be deterred from doing so again in the future.





---

[3] The bank accounts used for this analysis did not include the operating account for the defendant's medical practice. As such, these expenditures cannot reasonably be attributed to his business. And although the accounts in question did experience deposits other than COVID-19 emergency relief funds, approximately 72% of the available funds during the period in question are directly traceable to the defendant's fraud.

████████████████

████████████████ The defendant has led a privileged life and, other than his overreliance on a newfound diagnosis, can point to no past trauma, instability or hardship that would help explain the destructive decisions he has made as an adult. According to the PSR, the defendant was raised in an intact household where his basic childhood needs were met. (PSR ¶ 41.) He has healthy siblings and parents, with whom he enjoys close relationships. (Id.) Despite being born in Greece, the defendant derived United States citizenship, received an Ivy League education in this country and became a medical doctor, ultimately establishing a successful practice that not only employed numerous doctors, nurses and staff but earned several million dollars in annual revenue. (Id. ¶¶ 54, 60.) In fact, owing to the defendant's earning capacity, his wife—who herself attended medical school—has not had to work during their marriage. (Id. ¶ 42.) Other than GERD and high cholesterol, the defendant has no medical issues of which to speak. (Id. ¶ 46.) Nor does his wife or their teenage children. (Id.) In other words, unlike many defendants who appear before the Court the products of unfortunate circumstances, this defendant has enjoyed every opportunity and privilege of citizenship; there is simply no excuse for his behavior and no basis for a downward variance at sentencing.

IV. Conclusion

Based on the foregoing, the government respectfully submits that a sentence within the range of 63 to 78 months' imprisonment, together with a fine of not less than $80,000 and full restitution to the government, is reasonable and appropriate in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Anthony Bagnuola
Anthony Bagnuola
Assistant U.S. Attorney
(631) 715-7849

cc: Clerk of the Court (GRB) (via ECF and e-mail)
Counsel of Record (via ECF and e-mail)
U.S. Probation Officer Steven Guttman (by E-mail)